Celestino v. Consolidated Citrus Merritt McAllister v. Consolidated Citrus Under De Novo's standard of review, this court should reverse the finding of joint employment for two reasons. First, it is undisputed that under the contract between Consolidated Citrus, the harvester, and Ruiz Harvesting, the labor contractor, that Ruiz Harvesting and Ruiz Harvesting alone had the exclusive right to control the workers. Second, if we look to the indicia of control that the district court analyzed, those indicia are all primarily agricultural decisions that this court has said in Amable and Martinez-Mendoza may not be considered as elements of control, do not indicate control. This is the second time we're before the court. The first time, 15 months ago or so, the court decided that the standard that should apply here is the common law test of agency to determine joint employment. Previously, the district court had applied the suffers or permits to work standard, which under the Fair Labor Standards Act, which is a very forgiving standard, and looks to considerations of economic dependency instead of common law considerations of control. The court remanded to the district court to apply the common law test. It did not authorize the court to take additional fact-finding, and everyone agreed that that was the proper way to proceed. On the same facts, the district court held again that Consolidated Citrus was a joint employer. The first time around, under the Fair Labor Standards Act, the court had said that the control consideration, which is a factor in the Fair Labor Standards Act analysis, actually favored Consolidated Citrus. This time around, the court, again on the same facts, said that control actually favors the workers. When we break down and look at the facts that the district court considered this time around, I think there are really sort of eight key points that the district court thought favored a finding of control, which is the touchstone of the standard under the common law, and those are as follows. That Consolidated Citrus had the right to set the roadside and pick rate that it paid to Ruiz Harvesting, but that was just to Ruiz Harvesting, its labor contractor. That was as part of the agreement between Consolidated Citrus and the labor contractor. Second, that Consolidated Citrus had the right to halt work in the groves for any reason, which is a standard feature that any landowner would request of a labor contractor on its property. The third is that Consolidated Citrus mandated that Ruiz Harvesting followed the citrus canker procedures, which actually the state of Florida had imposed on all citrus growers to handle a serious problem of citrus canker throughout harvest groves in Florida. The fourth is that Ruiz Harvesting said to pick particular blocks based on fruit ripeness. Again, an agricultural decision that any landowner or harvester would know. Sixth, that they fill particular cartons or trailers with the harvested fruit, because that was the fruit that Consolidated Citrus was going to take to the processors to turn into juice. Seven, that Consolidated Citrus had supervisors on the property, and the property is about 8,000 acres, and they drove around on the property to check in with the various crews. Ruiz Harvesting was not the only crew. There were other labor contractors that had crews. Consolidated Citrus had their own crews. And they maybe spent about 10 or 15 minutes checking in just to make sure that fruit was being picked and was being put in the right place. They never interacted directly with the workers. That's undisputed. Instead, if there was any information to pass along, it was only to the Ruiz Harvesting supervisors. In fact, this court in the prior appeal observed that Ruiz, that Consolidated Citrus, had very little to no supervisory relationship with the workers themselves. And finally, Consolidated Citrus performed some random audits of Ruiz Harvesting's books, and primarily because there are known to be predatory practices among labor contractors. And Consolidated Citrus was, in some sense, trying to ensure that Ruiz Harvesting both maintained its commitments, followed through on its commitments under the labor contract, and also to protect the workers. So really, if we look at these eight factors, we break them down essentially into purely agricultural decisions that any landowner would have the right to engage in. This court said in Amable and Martinez-Mendoza are the kinds of agricultural decisions that landowners get to make that do not indicate control. The second bucket are acts that Consolidated Citrus took either as a party to the contract to oversee what Ruiz Harvesting did to make sure that it was complying with its obligations under the labor contract, or to protect the workers. And it makes sort of neither good sense nor good policy for acts that Consolidated Citrus took simply to protect the workers, to somehow become factors that favor control and Consolidated Citrus being held liable as a joint employer for actions that Ruiz Harvesting and Ruiz Harvesting alone committed. The kickbacks that Ruiz Harvesting demanded, it's undisputed, were solely Ruiz Harvesting's wrongdoing and bad acts, and that Consolidated Citrus had no knowledge of it whatsoever. If the court doesn't have questions, I see. I'm happy to reserve the balance of my time for rebuttal, but we think that under a de novo standard review, especially following this court's decisions in Amable and Martinez-Mendoza, which are even applying a more forgiving standard for the workers, that the facts here simply do not support control at the level of the common law test. Thank you, Your Honors. I'll reserve my time. Mr. Lopez. Yes. David Lopez, Allenton & Golden in Washington, D.C. With me is Victoria Mez Estrada with Florida Legal Services. The focus of the common law agency test is the right to control. So let me start out by saying that the district court's decision and analysis here is an excellent blueprint for this court in terms of examining that issue. I understand that this is de novo review, but as this court mentioned in its previous decision, there's been extensive fact-finding, and what the district court did is went back and used the facts from the six-day trial and applied them, applied the common law agency test. I have some concerns about using things that CCLP did to, in the interest of, which seemed to be in the interest of the workers, such as auditing the books and things of that nature, against CCLP in the common law agency principles determination, particularly when they're being held liable anyway under the FLSA employer, joint employer standard. Maybe you want to address that. Yes. You know, I think that the factors that the district court relied upon in finding right to control consisted not only of some of those payroll mechanisms that consolidated citrus argues were designed to protect the workers, but also included some very fundamental indicia of control, such as the ability to unilaterally stop work at any time. That was in the contract. Isn't that also in part, though, for, at least in part, for the benefit of the workers? For example, if there's lightning in the area, that's what I understood, that at least some of it was, and some of it's for the benefit of CCLP, no doubt. If the product is not up to par or whatever, they might want to change fields. But some of it is also for the benefit of the workers. Well, I'm not sure if it's in the record with respect to that particular contractual provision. What is in the record is that CCLP could stop work for any reason. And what is also in the record is the testimony from one of the supervisors that that did, in fact, happen. When the supervisor went out to the field and saw that there was garbage and saw that there were messes out there, the supervisor, in fact, sent the crew home. The CCL supervisor sent the work home. So that is, you know, a reflection of initiative control. Another fact that I think is really important is that CCLP unilaterally, unilaterally required Ruiz to deduct. In fact, Ruiz didn't deduct at CCLP, deducted an hour from his paycheck. So let me ask you this. Is it your position that if we don't consider the things that were arguably done primarily for the benefit of the workers, that there's still enough under the common law principles of agency to find them a joint employer? Well, I mean, I think under the common law principles, Your Honor, the common law principles do not examine the motive of the conduct. I recognize that, but also, I mean, we have to think about the practical implications of what we're doing. And if the practical implications are that an employer who is trying to comply with its FLSA requirements and its visa requirements and things of that nature is then held liable as a result of that, I mean, I think that's something we need to take into consideration. So my question is, again, if we don't consider those things that are arguably primarily for the benefit of the workers, is it your position that there's still enough to hold CCLP liable as a joint employer under the common law principles of agency? Yes, Your Honor, I think there is, and I think that's the correct result because what CCP did not do here is the most obvious step. CCP did not ask the workers at any point if they were being required to kick back any payments. CCP also did not take the obvious step of requiring the contractor to be sufficiently capitalized. So CCP got the benefit of this bargain, right? CCP is like, we're going to be extensively involved, we're going to be exclusively involved with respect to all of the canker protection procedures, but we'll take some modest steps with respect to our compliance with federal wage and hour laws. But it didn't take the obvious step. This is not a case of don't let a good deed go unpunished. This is a company that had enormous control based on, I think, a very thorough analysis of the record. Mr. Lopez, what do you say about the eight points that your colleague made? There are classic things a landowner would do. Well, I mean, I think first of all— With the exception of looking after the workers to make sure of those corruption. Well, let me— They're treated fairly by their own employer. What do you say about the argument that most of these things were things that a typical Orange Grove operator would do? Let me say this. My colleague cites a model and Martinez-Mendoza. No, no, no. What do you say about the facts that she recited? Not the cases, the facts. Okay. I understand that. With respect to the facts, with respect to the law to start out— Can you tell me about the facts? She rattled off a bunch of facts. Okay. Circumstances that a typical landowner, under these circumstances, would engage in certain conduct. Okay, I think— As demonstrating nothing about control. So what's your response to those facts? Well, I mean, I've already talked about the right to halt work at any time. That's not—I mean, there's nothing in the record that says that's something a typical landowner would do, and that's, you know, squarely within the Common Land Joint Employer Test. The whole idea of being able to go beyond state-mandated requirements with respect to contamination procedures— I mean, that seems like an—to me, that seems like an agricultural thing, right? Because if you allow citrus canker into your fields, then you've lost— So that seems like an agricultural thing. So I would set that one aside as well. Unless there's something I'm missing. No, except that it went beyond what was required by the state. But what difference does it make whether it's required by the state or not if it comes down to the existence or nonexistence of your business because you have no crops?  If I could say something with respect to the law, Your Honor. My colleague cites Amauble and Martinez-Mendoza, right? Those are both felicitous cases. The best felicitous cases here is the 11th Circuit previous decision. Okay, the 11th Circuit has already addressed this issue of whether these are agricultural decisions, whether CC was overly active in its previous decision when it upheld the district court's finding that CC was a joint employer. This court has already addressed it on this record. But there's a difference between the definition of a joint employer under FLSA and the definition of a joint employer under common law agency principles. Wouldn't you agree that under common law agency principles, it's a narrower definition than under the FLSA? I think the courts have certainly said that the FLSA definition is one of the broadest definitions possible. However, with respect to the factors relied upon twice by the district court, supervision and payroll methods and personnel, there is no case authority indicating that those factors need to be treated differently. In fact, this court in Antinor said that the whole supervision factor, which was one of the central reasons in both of the district court decisions for finding a joint employer, is based on common law. Can we go back to what your colleague... You're rebutting what their argument is. Yes. And they listed things that a landowner under the circumstances would do regardless of control. You pick out one, and that is they could stop work. Okay. What tick off the rest of them you think show joint control? Well, unilaterally, I mean, they unilaterally require the contractor to deduct an hour from the paycheck. No, no, on the premises, in terms of managing the grove. Okay. She ticked off a series of facts that dealt on the management of the grove that didn't show joint employer. No, I think those factors do show joint employer. That was her argument. You think that they all show joint employment? Yes. I mean, I think all those factors actually do show joint employment, Your Honor. I think they do show joint employment. And some of them are more related. Look, this is a grower. I mean, what they do is they produce citrus, right? So anything dealing with workers is ultimately going to have to do with agriculture. But this is not a case like a model, okay? This is not a case where it's a question of when you plant the seeds and when you plant the crops. This is a case where the supervisors went out there and for 90 minutes a day, were able to direct the worker, deal with the contractor supervisor. And how many contractors were on the premises? I'm not sure exactly. Oh, you do? Because it's in the record. Yeah, it's in the record. Tell us how many. I mean, I could pull it up in terms of how many. You're talking about 8,000 acres of groves. Right. This wasn't the only contractor on the job. No. Well, what does the record tell us? I'm not finding the number exactly in front of me, Your Honor. Well, there were several. Would you put it that way? No. There were several. Yes. Yes. And so the supervisors were dealing with several contractors. But what the record shows is that each of the grower supervisors dealt with the crews at least 90 minutes per day. That's what the record shows. I understand. Regardless of how many harvesters. If I could also say something, Your Honor, with respect to the argument, which is just completely incorrect, that the district court changed its analysis. If you look at what the district court did, the district court actually applied the same analysis in both the Felisa case and the common law agency case. What the district court did is the district court cited the record in this case and basically said, look, everything under the contract, the right to hire, the right to fire, that does not show control, right, consistent with their argument. But then, consistent with the earlier decision under Felisa, the district court went through all of the factors that showed substantial supervisory control. So the only difference is that the district court did not include a separate subheading in this decision. But the analysis is exactly the same. The district court cites the previous record, cites the previous decision. The district court did not flip-flop. The district court looked again at substantial supervisory control on the record of this case as a means to find joint employer. The district court also noted that the previous district court judge in looking and issuing a summary judgment order also found there was substantial supervisory control. It's hard not to look at this record and not see substantial supervisory control, certainly in a way that goes beyond a model, right, and certainly in a way that this court recognized in affirming the district court's previous decision under Felisa. I understand that the standards are different, okay, but the economic realities test subsumes the control test, and it was a control test, the supervision, the payment methods that drove the decision of the district court here and on de novo review should lead this court to affirm a finding of joint employer. It's the same record. It's the same record, okay. Celestino Garcia is the precedent for this court in terms of addressing issues of agricultural decisions, overly active court. It's the same record, right. And there's nothing to indicate that you, nothing to indicate in any of the cases cited by Consolidated Citrus indicating that you need to consider supervision in a much more narrow fashion under the common law agency test as compared to the economic dependencies test. The economic dependency test includes several factors that aren't part of the common law agency test, but two of those factors, three of those factors, ownership of the land, common, supervision and control, common, payment method and personnel practices, common. And those were the three primary factors that the district court twice relied upon on an extensive record to find common law joint employer. And that's an appropriate decision because as a landowner, as a grower who could go out there and stop work at any time, the grower was actually in a position, and this court has recognized that with respect to land ownership, was in a position to be able to safeguard against labor violations, right. It was in a position to do the very obvious thing, ask the workers, have you been asked to kick back money? The obvious thing, if you're dealing with a contractor, are you sufficiently capitalized, right, under the indemnification agreement? Very simple steps that the grower could have taken. So if you don't have further questions, we ask that you affirm the district court. Thank you. Ms. McAllister. Thank you, Your Honor. Just a couple points. First of all, I think the district court did not get it exactly right. In fact, it flip-flopped. It got it right the first time when it said that there was no evidence or that the indicia of control favored consolidated citrus. The consistency is in supervising the workers, and the district court did say the first time around that there was some supervisory relationship mostly related to citrus canker. But this court implicitly disagreed in the last appeal where it actually said that there was little to no supervisory control, and that's because Ruiz Harvesting is the labor contractor for consolidated citrus. Ruiz Harvesting is the employer of these workers, and there's no dispute with respect to that. But Ruiz Harvesting is only one of many labor contractors that consolidated citrus use. There were anywhere from 200 to 250 workers in the grove at that one time. Your Honor asked the question as to sort of how many. There are 10 to 15 different labor contractors, and consolidated citrus had some of its own workers that were H-2A visa workers as well. What about Mr. Lopez's point about, for example, the fact that your client deducted an hour from the hours that he kept for each of the workers? Yeah, and I think, you know, so part of the reason for that is to standardize, so to ensure it's the same kind of worker protection reason that we discussed earlier that Your Honor was concerned about, is that if you can standardize this so that everyone gets a similar deduction, so that it's not left in the hands of the contractor, which can inflate or change the practices. It was an act motivated to ensure uniformity and to produce accurate pay records. It wasn't done with any other kind of control or active supervising of the workers. So I don't, you know, if that's the best they have, I certainly don't think that rises to the level of the kinds of considerations that this Court has held before our control. And it's, again, back in that bucket of care that's taken to ensure that both Ruiz Harvesting is meeting its obligations under the labor contract and to protect the workers. Thank you, Your Honors. Thank you. The Court will be in recess until tomorrow morning at 9 o'clock. All rise.